USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3|27|18

JENIECE ILKOWITZ and ADAM ILKOWITZ,

Plaintiffs,

- against -

MICHAEL DURAND, MARLENE ZARFES a/k/a
MARLENE DURAND, ALAN C. PILLA,
HOULIHAN LAWRENCE, INC., JANE H.
CARMODY, THE JUDICIAL TITLE
INSURANCE AGENCY LLC, and ENCO HOME
INSPECTIONS LLC.,

Defendants.

**MEMORANDUM
OPINION & ORDER**

17 Civ. 773 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

In this action, Plaintiffs Jeniece and Adam Ilkowitz assert claims against

Defendants Michael and Marlene Durand, Alan Pilla, Houlihan Lawrence, Inc., Jane Carmody,

The Judicial Title Insurance Agency LLC, and ENCO Home Inspections LLC (collectively,

"Defendants") for (1) violations of the Residential Lead-Based Hazard Reduction Act (the "Lead

Paint Act"), 42 U.S.C. §§ 4851 et seq.; (2) negligent misrepresentation or concealment; (3)

fraud; (4) breach of contract; and (5) negligence. (Cmplt. (Dkt. No. 1) ¶¶ 1, 22-67) Plaintiffs

claim that Defendants did not disclose the presence of known-lead based hazards before

Plaintiffs' purchase of a residence, and Plaintiffs seek damages related to the cost of repairs to

the home and any resulting medical expenses. (See id. ¶¶ 12-21, 67)

The Durands, Houlihan Lawrence, and Carmody filed cross-claims for

contribution and/or indemnification against each other, Alan Pilla, Judicial Title, and ENCO.

(See Ans. (Dkt. No. 29) at 6-8; Ans. (Dkt. No. 59) ¶¶ 76-77) On April 25, 2017, the Durands

filed a stipulation dismissing their cross-claim for contractual indemnification as against Judicial

Title. (Stip. (Dkt. No. 62)) On June 19, 2017, Houlihan Lawrence and Carmody filed a stipulation dismissing their cross-claims against Judicial Title. (Stip. (Dkt. No. 68)) Accordingly, the only remaining cross-claim against Judicial Title is the Durands' cross-claim for common-law contribution.

On June 27, 2017, Plaintiffs filed a stipulation dismissing their claims against ENCO. (Stip. (Dkt. No. 69) at 1) The Durands, Houlihan Lawrence, and Jane Carmody have likewise filed stipulations dismissing their cross-claims against ENCO. (Stips. (Dkt. Nos. 72, 73)) Accordingly, ENCO is no longer a party to this action.

Defendant Judicial Title has moved to dismiss, or in the alternative, for summary judgment on (1) Plaintiffs' negligence claim; and (2) the Durands' cross-claim for contribution. (Jud. Title Mot. (Dkt. No. 75)) Judicial Title has also moved for sanctions pursuant to Fed. R. Civ. P. 11 against Plaintiffs and/or their attorney Jean-Claude Mazzola. (Jud. Title Mot. (Dkt. No. 102) at 1)

Defendant Alan Pilla has moved to dismiss (1) Plaintiffs' claims against him; and (2) the Durands', Houlihan Lawrence's, and Jane Carmody's cross-claims for contribution and/or indemnification against him. (Pilla Mot. (Dkt. No. 82))

For the reasons stated below, Judicial Title's motion for summary judgment will be granted. Judicial Title's motion for sanctions will be granted in part and denied in part. Pilla's motion to dismiss will be granted.

# BACKGROUND

## I.   THE COMPLAINT'S FACTUAL ALLEGATIONS[1]

Plaintiffs Jeniece and Adam Ilkowitz are married and reside in Pelham, New York. (Cmplt. (Dkt. No. 1) ¶ 5) Plaintiffs' claims arise out of the Durands' sale of a residence located at 498 Manor Lane, Pelham, New York (the "Property") to Plaintiffs on March 9, 2015. (Id. ¶ 12)

Defendant Houlihan Lawrence is a real estate brokerage firm, and Jane Carmody is a real estate broker at Houlihan Lawrence. (Id. ¶ 8) Alan Pilla is the Durands' real estate attorney. (Id. ¶¶ 9, 16) Defendants Houlihan Lawrence, Carmody, and Pilla allegedly acted "as agents of the Durand Defendants" in the sale of the Property. (Id. ¶ 12)

Judicial Title is a title insurance company. (See id. ¶ 10) As part of the sale and closing process, Judicial Title performed a title search concerning the Property. (Id. ¶ 12) The title search did not reveal a "history or presence of lead in the Property." (Id.)

On March 6, 2015, the Durands signed a Disclosure of Information on Lead-Based Paint Hazards form (the "Lead Disclosure Form") as part of the contract of sale concerning the Property. (Id. ¶ 15; Cmplt., Ex. B (Lead Disclosure Form) (Dkt. No. 1-2) at 2) The Durands certified on this form that they had "no knowledge of lead-based paint and/or lead-based paint hazards in the [Property]," and that they had "no reports or records pertaining to lead-based paint or hazards" in the Property. (Cmplt., Ex. B (Lead Disclosure Form) (Dkt. No. 1-2) at 2) The Durands also signed the form's Certification of Accuracy, stating that they had

---

[1]  Unless otherwise noted, the following facts are drawn from the Complaint, exhibits attached to the Complaint, or documents incorporated by reference or that are integral to the Complaint. The Complaint's factual allegations are presumed true for purposes of resolving Defendant Pilla's motion to dismiss. See DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 110-11 (2d Cir. 2010).

"reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate." (See id.)

The Lead Paint Act requires the seller's "agents" to initial the Lead Disclosure Form, and acknowledge that they have "informed the seller of the seller's obligations under 42 U.S.C. § 4952(d) and [are] aware of [their] responsibility to ensure compliance." (Cmplt. (Dkt. No. 1) ¶ 16) According to Plaintiffs, Houlihan Lawrence, Carmody, and Pilla acted as "agents" of the Durands. (Id.) They did not initial the Lead Disclosure Form or make the required acknowledgement, however. (Id.)

Unbeknownst to Plaintiffs, the Property had been cited on multiple occasions for lead contamination by the Westchester County Department of Health. (Id. ¶ 13) In a March 30, 2001 letter to the Durands, the Health Department cited the Property for lead contamination at levels exceeding the Health Department guidelines. (Id.) In follow-up inspection, the Health Department found that the Property was not in compliance with residential lead contamination laws and regulations. (Id.) The Health Department memorialized these findings in letters to the Durands and in reports that are available to the public through public records requests. (See id., Ex. A (Public Records) (Dkt. No. 1-1))

Plaintiffs did not become aware that the Property contained dangerous amounts of lead until after the purchase of the Property, however. (Cmplt. (Dkt. No. 1) ¶ 19) After learning that the Property was contaminated with lead, Plaintiffs had their daughter tested for the presence of lead in her blood, and she tested positive. (Id. ¶ 20) Plaintiffs then undertook costly repairs to the Property "in the interest of their family's health." (Id. ¶ 21) Had the "Defendants disclosed the fact that the Property had been cited for and/or currently contained lead," Plaintiffs would not have purchased the Property. (Id. ¶ 19)

The Complaint was filed on February 1, 2017. In the First Cause of Action, Plaintiffs claim that the Durands – as sellers – and Pilla, Houlihan Lawrence, and Jane Carmody – as the sellers' "agents – did not make the required disclosures under the Lead Paint Act. (Id. ¶¶ 24-35) In Second and Third Causes of Action, Plaintiffs claim that the Durands, Houlihan Lawrence, Carmody, and Pilla induced Plaintiff to purchase the house by negligently and/or intentionally misrepresenting, concealing, or failing to disclose material facts regarding known lead-based paint hazards in the Property. (Id. ¶¶ 36-54) In the Fourth Cause of Action, Plaintiffs claim that the Durands breached the residential sale contract by failing to disclose material facts concerning the presence of lead, as required by "the specific terms and assurances of the contract of sale." (Id. ¶¶ 55-61) In the Fifth Cause of Action, Plaintiffs assert a claim against all of the Defendants, alleging that they failed to discharge their "duty [to] ensure the Property adhered to the contract of sale and was not in a hazardous condition," and to discover and disclose any known lead-based risks. (Id. ¶¶ 62-67)

## II.     FACTS REGARDING JUDICIAL TITLE'S TITLE SEARCH[2]

In connection with Plaintiffs' purchase of the Property from the Durands, Plaintiffs hired Judicial Title to perform a title search of the Property prior to the closing. (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 1; Pltf. R. 56.1 Counterstmt. (Dkt. No. 91) ¶ 1; Ilkowitz Aff., Ex. F

---

[2] To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." (citations omitted)). Where Plaintiffs have disputed Judicial Title's characterization of cited evidence, and have presented an evidentiary basis for doing so, the Court has relied on Plaintiffs' characterization of the evidence. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion). Unless otherwise indicated, the facts cited by the Court in this section of the Order are undisputed.

(Insurance Closing Estimate) (Dkt. No. 87-6) at 2)  It is undisputed that Judicial Title did not produce to Plaintiffs any information or records disclosing lead contamination in, or lead-related violations regarding, the Property prior to the June 19, 2015 closing.  (Pltf. R. 56.1 Counterstmt. (Dkt. No. 99) ¶ 30; Def. R. 56.1 Resp. (Dkt. No. 95) ¶ 1)

In connection with the title search, Plaintiffs paid Judicial Title $324.00 to perform searches of municipal housing, building, fire, and certificate of occupancy records related to the Property.  (See Pltf. R. 56.1 Counterstmt. (Dkt. No. 99) ¶ 23; Def. R. 56.1 Resp. (Dkt. No. 95) ¶ 1; Ilkowitz Aff., Ex. F (Insurance Closing Estimate) (Dkt. No. 87-6) at 2; Morano Decl., Ex. 4 (Departmental Search Results) (Dkt. No. 77-4)).

The title report set forth the results of a municipal data search – conducted on March 13, 2015 – listing the unpaid taxes, water rates, and assessments "which are properly filed and indexed liens as of the date of the search." (Morano Decl., Ex. 3 (Municipal Data Search Report) (Dkt. No. 77-3) at 1; Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 4)  Judicial Title's municipal data search report states: "[o]ur policy does not insure against such items which have not become a lien up to the date of the policy or installments due after the date of the policy." (Morano Decl., Ex. 3 (Municipal Data Search Report) (Dkt. No. 77-3) at 1; Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 5)

Judicial Title's title report also includes the results of its departmental searches – including searches of municipal housing, building, fire, and certificate of occupancy records. (See Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 6; Morano Decl., Ex. 4 (Departmental Search Report) (Dkt. No. 77-4) at 1; Ilkowitz Aff., Ex. F (Insurance Closing Estimate) (Dkt. No. 87-6) at 2)  The first sentence of Judicial Title's Departmental Search Report states:

> Any searches or returns reported herein are furnished FOR INFORMATION ONLY. They will not be insured and the Company assumes no liability for the accuracy thereof.

They will not be continued to the date of closing.

(Morano Decl., Ex. 4 (Departmental Search Report) (Dkt. No. 77-4) at 1)

The first page of the Departmental Search Report also lists the municipal departments that were and were not searched. (Id.) In rows marked "Housing & Building," "Fire Dept. Search," "Cert. of Occupancy," and "Street Report," the Department Search Report states "REPORT ATTACHED." (Id.) As to the Health Department, the first page of the report is marked "N/A." (Id.)

The Departmental Search Report states that the Property had no Building Department or Fire Department violations. (See id. at 2-3) The report also states:

> Municipal Data Services Inc. certifies that the records of the above municipal agency were examined on behalf of THE JUDICIAL TITLE INSURANCE AGENCY LLC. The information reported above is a true and accurate abstract of the information on file therein. This report is submitted for information purposes only. There are no intended third party beneficiaries. No liability is assumed.

(Id.)

Prior to the closing, Judicial Title provided Plaintiffs with "Schedule B," a list of matters and items that would appear as exceptions from coverage. (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 2; Pltf. R. 56.1 Counterstmt. (Dkt. No. 98) ¶ 2) "Schedule B" states that "[a]ll municipal departmental searches are not insurable items and this company assumes no liability for the accuracy." (Morano Decl., Ex. 2 (Schedule B) (Dkt. No. 77-2) at 1)

Effective January 1, 2015, and confirmed at the June 19, 2015 closing, Judicial Title certified to Plaintiffs "that a good and marketable title to [the Property] described in Schedule A, subject to the liens, encumbrances and other matters, if any, set forth in this certificate may be conveyed and/or mortgaged by: **MICHAEL DURAND AND MARLENE ZARFES, HUSBAND AND WIFE, AS TENANTS BY THE ENTIRETY.**" (Morano Decl.,

Ex. 5 (Certificate of Title) (Dkt. No. 77-5) at 1 (emphasis in original); Def. R. 56.1 Stmt. (Dkt.

No. 76) ¶ 11)  The Certificate of Title lists First American Title Insurance Company as the

underwriter. (Morano Decl., Ex. 5 (Certificate of Title) (Dkt. No. 77-5) at 1).

The Certificate of Title states that

> [a]ny claim arising by reason of the issuance hereof shall be restricted to the terms and
> conditions of the standard for [sic] of title insurance policy.  If title, interest or lien to be
> insured was acquired by the prospective insured prior to delivery hereof, the Company
> assumes no liability except under its policy when Issued.

(Id.)

The Certificate of Title sets forth twelve "Conditions and Stipulations."  (See id.

at 2)  Condition and Stipulation No. 2 provides:

> The certificate is preliminary to the issuance of such policy or policies of title insurance
> and all liability and obligations hereunder shall cease and terminate six months after the
> effective date hereof when the policy or policies committed for shall be issued by this
> company.

(Id.)

Condition and Stipulation No. 10 provides:

> When municipal department searches are requested or required, the accuracy of the
> returns therein are not guaranteed nor are such searches continued beyond the date of the
> original search.  Any Certificate of Occupancy, Certificates of Completion or Building
> Permits issued subsequent to the date of this certificate, or any dismissals or notices of
> removal of any building or housing violations set forth herein, must be submitted to this
> company prior to closing if an amendment to any of the municipal department searches is
> requested or required as this company does not independently conduct such searches.

(Id.)

At the closing on June 19, 2015, Plaintiffs received a title insurance policy issued

by Judicial Title as the agent for First American Title Insurance Company (the "Policy").  (Def.

R. 56.1 Stmt. (Dkt. No. 76) ¶ 15; Morano Decl., Ex. 6 (Title Insurance Policy) (Dkt. No. 77-6);

Ilkowitz Aff., Ex. C (Statement of Closing Title) (Dkt. No. 87-3) at 2)  The Coverage Statement

section in the Policy states:

> This Policy covers Your actual loss from any risk described under Covered Risks if the event creating the risk exists on the Policy Date, or, to the extent expressly stated, after the Policy Date.

(Morano Decl., Ex. 6 (Title Insurance Policy) (Dkt. No. 77-6) at 12)

As set forth in the Policy's "Exclusions," Plaintiffs have no coverage for "loss, costs, attorney's fees, and expenses resulting from . . . the existence or violation of any law or government regulation[]" – including those concerning "environmental protection" – unless "notice of the violation or enforcement appears in the Public Records at the Policy Date." (Id. at 14, ¶ 1(f)) The Policy defines Public Records as:

> records that give constructive notice of matters affecting Your Title, according to New York State law. With respect to Section 1.f. of the Exclusion, "public records" shall also include environmental protection liens filed in the records of the Clerk of the United States district court for the district in which the Land is located.

(Id. at 14) The Policy defines "Title" as "the ownership of the interest in the Land, as shown in Schedule A." (Id.)

The Policy contains twelve "Conditions." (See id. at 14-16) Condition No. 9 provides:

> [t]his Policy, with any endorsements, is the entire contract between You and Us. To determine the meaning of any part of this Policy, You must read the entire Policy. Any changes to this Policy must be agreed to in writing by Us. Any claim You make against Us must be made under this Policy and is subject to Its terms.

(Id. at 16) It is undisputed that Plaintiffs are not asserting any claim under the Policy. (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 21; Pltf. R. 56.1 Counterstmt. (Dkt. No. 98) ¶ 21)

After the closing, Plaintiffs' daughter had an appointment with her pediatrician, was tested for lead exposure, and tested positive for lead. (Ilkowitz Aff. (Dkt. No. 87) ¶ 9) Plaintiffs then searched the Village of Pelham Manor's public records concerning the Property,

9

and found two Westchester County Health Department letters to the Durands – dated March 30, 2001 and April 26, 2001 – disclosing lead contamination at the Property. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 99) ¶¶ 25-29; Def. R. 56.1 Resp. (Dkt. No. 95) ¶ 1; Ilkowitz Aff., Ex. D (Lead Contamination Letters) (Dkt. No. 87-4) at 14-15) The Village of Pelham Manor's building inspector is copied on both letters. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 99) ¶ 27; Def. R. 56.1 Reply (Dkt. No. 95) ¶ 1; Ilkowitz Aff., Ex. D (Lead Contamination Letters) (Dkt. No. 87-4) at 14-15)

## DISCUSSION

### I.    RULE 12(b)(6) STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

Allegations that "are no more than conclusions are not entitled to the assumption of truth," however. Iqbal, 556 U.S. at 679. A pleading is conclusory "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" id. at 678, offers "'a formulaic recitation of the elements of a cause of action,'" id., and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007). While legal

conclusions "can provide the complaint's framework, they must be supported by factual allegations." Iqbal. 556 U.S. at 679.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)). For documents to be incorporated by reference, "the complaint must make 'a clear, definite and substantial reference to the documents.'" DeLuca v. AccessIT Grp., Inc., 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (quoting Helprin v. Harcourt, Inc., 277 F.Supp.2d 327, 330-31 (S.D.N.Y.2003)). "[L]imited quotation" of a document, Goldman v. Belden, 754 F.2d 1059, 1066 (2d Cir. 1985), or a mere passing reference to a document, does not incorporate the document into the complaint. See, e.g., Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) ("Limited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint."); Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989) (although the amended complaint "discussed [certain] documents and presented short quotations from them[,]" these passing references and "brief[] excerpt[s]" are insufficient for incorporation by reference).

"Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." DiFolco, 622 F.3d at 111 (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)). For a document to be integral to a complaint, "the plaintiff must have (1) 'actual notice' of the extraneous information and (2) 'relied upon

th[e] document[] in framing the complaint.'" DeLuca, 695 F. Supp. 2d at 60 (quoting Chambers, 282 F.3d at 153).

Where a district court considering a motion to dismiss is "presented with matters outside the pleadings," there are "two options." Chambers, 282 F.3d at 154. The court either "exclude[s] the extrinsic documents" or it "convert[s] the motion to one for summary judgment," giving the parties adequate notice and an opportunity to "submit the additional supporting material contemplated by Rule 56." Id. (citations omitted); Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."). "'Federal courts have complete discretion to determine whether . . . to convert [a] motion [to dismiss] to one for summary judgment.'" Abbey v. 3F Therapeutics, Inc., No. 06 Civ. 409 (KMW), 2009 WL 4333819, at *5 (S.D.N.Y. Dec. 2, 2009) (quoting Carione v. United States, 368 F. Supp. 2d 186, 191 (E.D.N.Y. 2005)).

A.     **Documents Considered in Connection with Pilla's Motion to Dismiss**

In connection with Defendant Pilla's motion to dismiss, both Plaintiffs and Pilla have requested that this Court consider the residential contract of sale and closing statement. (Pltf. Br (Dkt. No. 88) at 9; Bergson Decl. (Dkt. No. 84) ¶ 6) While the Complaint does not quote from the residential contract of sale or closing statement, these documents are integral to the Complaint, because they provide the factual premise for Plaintiffs' claims. Indeed, the residential contract of sale and closing are repeatedly discussed throughout the Complaint. (See Cmplt. (Dkt. No. 1) ¶¶ 12, 28, 37, 40-44, 48-52) Because Plaintiffs had actual notice of and relied upon these documents in drafting the Complaint, the Court will consider them in resolving

Defendant Pilla's motion to dismiss. See Korova Milk Bar of White Plains, Inc. v. PRE Properties, LLC, 11 Civ. 3327 (ER), 2013 WL 417406, at *6 (S.D.N.Y. Feb. 4, 2013) (Courts may "properly consider documents or information [outside of the Complaint] . . . if the plaintiff has knowledge or possession of the material and relied on it in drafting the complaint." (citations omitted)).

Plaintiffs have submitted an affidavit from Adam Ilkowitz alleging additional facts regarding Pilla's relationship with the Durands. Attached as an exhibit to the Adam Ilkowitz affidavit is a March 10, 2015 email from Pilla to Brett Lando – Plaintiffs' real estate attorney – with the contract of sale. (See Ilkowitz Aff. (Dkt. No. 87) ¶¶ 2-6; Ilkowitz Aff., Ex. B (Pilla March 10, 2015 email) (Dkt. No. 87-2) at 2) There is no mention of the March 10, 2015 email in the Complaint, however, and both the Adam Ilkowitz affidavit and the March 10, 2015 email clearly constitute material outside of the Complaint. (See Cmplt. (Dkt. No. 1)) Accordingly, these materials will not be considered in ruling on Pilla's motion to dismiss. See Perez v. Harbor Freight Tools, No. 15 Civ. 05983 (ADS) (SIL), 2016 WL 4734635, at *3 (E.D.N.Y. Sept. 9, 2016) ("There are no allegations in the complaint, nor exhibits attached to the complaint, regarding a supposed November 2012 meeting between the Plaintiff and an EEOC investigator. . . . [T]his affidavit would be improper to consider in deciding the . . . Rule 12(b)(6) motion to dismiss unless the Court converts the Defendant's motion into one for a summary judgment pursuant to Rule 12(d)."), aff'd, 698 F. App'x 627 (2d Cir. 2017).

Moreover, Pilla's motion to dismiss will not be converted into one for summary judgment. There has been no discovery in this case, and it is well established that "summary judgment motions prior to discovery are disfavored." See, e.g., GMA Accessories, Inc. v. Croscill, Inc., No. 06 Civ. 6236 (GEL), 2007 WL 766294, at *1 (S.D.N.Y. Mar. 13, 2007).

Moreover, neither Plaintiffs nor Pilla have submitted a Rule 56.1 statement or sought summary judgment. (See Pilla Br. (Dkt. No. 85) at 6-14; Pltf. Br. (Dkt. No. 88) at 8-9; Vested Bus. Brokers, Ltd. v. Cty. of Suffolk, No. 16 Civ. 4945 (JMA) (SIL), 2017 WL 4122616, at *3 (E.D.N.Y. Sept. 15, 2017) (declining to convert a motion to dismiss into a motion for summary judgment where plaintiff submitted material outside of the complaint, because the "[d]efendants neither include a Rule 56.1 statement nor advocate for summary judgment in their brief")).

## II. CONVERSION OF JUDICIAL TITLE'S MOTION TO DISMISS INTO A MOTION FOR SUMMARY JUDGMENT

Judicial Title requests that this Court convert its motion to dismiss into a motion for summary judgment in accordance with Rule 12(d). (Jud. Title Br. (Dkt. No. 79) at 7)

Judicial Title has submitted material outside the pleadings in connection with its motion, including declarations and documents pertaining to its title search. (See Dkt. Nos. 76-78) Judicial Title gave Plaintiffs and the Durands formal notice of its request to convert the motion to dismiss into a motion for summary judgment. (See Judicial Title Ltr. (Dkt. No. 61)) Moreover, Plaintiffs and the Durands have submitted affidavits, declarations, and exhibits in opposition to Judicial Title's motion. (See Ilkowitz Aff. (Dkt. No. 87); Lee Decl. (Dkt. No. 81-1)) Judicial Title, Plaintiffs, and the Durands have also all submitted Local Rule 56.1 statements in connection with Judicial Title's motion. (Pltf. R. 56.1 Stmt. (Dkt. No. 98); Durands R. 56.1 Counterstmt. (Dkt. No. 81-7); Judicial Title R. 56.1 Stmt. (Dkt. No. 76)) Given these circumstances, this Court will convert Judicial Title's Rule 12(b)(6) motion into a motion for summary judgment.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that that party "is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)). "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" Yi Fu Chen v. Spring Tailor, LLC, No. 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks and citation omitted)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV. DEFENDANT PILLA'S MOTION TO DISMISS

Pilla has moved to dismiss Plaintiffs' claims against him as well as the cross-claims of the Durands, Houlihan Lawrence, and Carmody. (Pilla Mot. (Dkt. No. 82) at 1)

### A. Pilla's Motion to Dismiss Plaintiffs' Claims

#### 1. Lead Paint Act Claim

##### a. Applicable Law

"Congress enacted the Residential Lead-Based Paint Hazard Reduction Act as Title X of the Housing and Community Development Act of 1992." Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir. 2000) (citing Pub. L. No. 102-550 (codified at 42 U.S.C. §§ 4851-4856)). The Lead Paint Act was enacted to, inter alia, "develop a national strategy to build the infrastructure necessary to eliminate lead-based paint hazards in all housing as expeditiously as possible" and "encourage effective action to prevent childhood lead poisoning." 42 U.S.C. § 4851a(1), (3). "Any person" who "knowingly violates" the statute "shall be jointly and severally liable to the purchaser or lessee in an amount equal to 3 times the amount of damages incurred by such individual." 42 U.S.C. § 4852d(b)(1), (3).

In order to accomplish its statutory objectives, the Lead Paint Act "directs the Secretary of the Department of Housing and Urban Development ('HUD') and the Administrator of the Environmental Protection Agency (EPA') to promulgate regulations mandating the disclosure of lead-based paint hazards in privately owned housing that is sold or leased." Sweet, 235 F.3d at 84 (citing 42 U.S.C. § 4852d). The regulations issued by these agencies require that, "before the purchaser or lessor is obligated under any contract to purchase or lease the housing, the seller or lessor shall"

(A) provide the purchaser or lessee with a lead hazard information pamphlet, as prescribed by the Administrator of the Environmental Protection Agency under section

16

406 of the Toxic Substances Control Act [15 U.S.C.A. § 2686];

(B) disclose to the purchaser or lessee the presence of any known lead-based paint, or any known lead-based paint hazards, in such housing and provide to the purchaser or lessee any lead hazard evaluation report available to the seller or lessor; and

(C) permit the purchaser a 10-day period (unless the parties mutually agree upon a different period of time) to conduct a risk assessment or inspection for the presence of lead-based paint hazards.

42 U.S.C. § 4852d(a)(1).

The Lead Paint Act also directs HUD and EPA to promulgate regulations requiring a "Lead Warning Statement" in all contracts for the purchase and sale of "target housing," and specifies the content of this statement. See id. § 4852d(a)(2)-(3). Target housing is defined as "any housing constructed prior to 1978, except housing for the elderly or persons with disabilities, . . . or any 0–bedroom dwelling." 24 C.F.R. § 35.86.

The Lead Paint Act also contains a "compliance assurance" provision, which requires HUD and EPA to promulgate regulations imposing duties on the seller or lessor's "agent":

Whenever a seller or lessor has entered into a contract with an agent for the purpose of selling or leasing a unit of target housing, the regulations promulgated under this section shall require the agent, on behalf of the seller or lessor, to ensure compliance with the requirements of this section.

42 U.S.C. § 4852d(4). The regulations issued by the agencies define "agent" as

any party who enters into a contract with a seller or lessor, including any party who enters into a contract with a representative of the seller or lessor, for the purpose of selling or leasing target housing. This term does not apply to purchasers or any purchaser's representative who receives all compensation from the purchaser.

24 C.F.R. § 35.86.

Under the regulations, the seller's "agent" is required to inform and ensure that the seller complies with all of the seller's obligations under C.F.R. §§ 35.88, 35.90, and 35.92.

See 24 C.F.R. § 35.94(a). Accordingly, the "agent" must ensure that the seller (1) provides the

purchaser with an EPA-approved lead hazard information pamphlet and discloses any known

lead-based paint hazards in the property; (2) provides the purchaser with a 10-day period to

conduct an inspection of the premises for the presence of lead-based paint hazards; and (3)

provides the purchaser with the required "Lead Warning Statement" disclosing any known lead-

based paint hazards. See 24 C.F.R. §§ 35.88, 35.90, and 35.92; Pellegrini v. Century 21, No. 05

Civ. 30077 (MAP), 2007 WL 2219331, at *6 (D. Mass. July 20, 2007). Sellers, agents, and

purchasers must sign the "Lead Warning Statement," "certifying to the accuracy of the[]

statements" contained therein. See 24 C.F.R. § 35.92(a)(7). In the event that the seller does not

comply with his or her obligations, the "agent" must "personally ensure compliance with the

requirements of [24 C.F.R.] §§ 35.88, 35.90, and 35.92." See 24 C.F.R. § 35.94. An "agent

shall not be liable for the failure to disclose to a purchaser or lessee the presence of lead-based

paint and/or lead-based paint hazards known by a seller or lessor but not disclosed to the agent,"

however. 24 C.F.R. § 35.94.

  In order to state a Lead Paint Act claim against a seller, a plaintiff must establish

that (1) he or she was a purchaser; (2) defendant was a seller "who failed to make the proper

disclosures; (3) the purchased property was "target housing;" and (4) the "[sale] contract was

signed after the regulations" became effective. G.M.M. v. Kimpson, 92 F. Supp. 3d 53, 72

(E.D.N.Y. 2015); N'Jai v. Bentz, No. 13 Civ. 1212, 2016 WL 7404550, at *7 (W.D. Pa. Dec. 22,

2016), aff'd in part sub nom. N'Jai v. E.P.A., 705 F. App'x 126 (3d Cir. 2017). Where, as here,

plaintiff contends that a seller's "agent" is liable, plaintiff must allege sufficient facts to

demonstrate that the defendant was an "agent" within the meaning of the Lead Paint Act. In

particular, plaintiff must demonstrate that the defendant "enter[ed] into a contract with a seller

. . . [or] a representative of the seller . . . for the purpose of selling . . . target housing." See 24

C.F.R. § 35.86; Kearney v. Elias, No. Civ. 07 Civ. 149 (JL), 2008 WL 3502116, at *4 (D.N.H.

Aug. 11, 2008) (dismissing Lead Paint Act claim where plaintiffs "failed to show any 'contract,'

either express or implied, between [the alleged agent] and [the seller] for the purpose of selling

the property"); Am. Rental Mgmt. Co., et. al, HUDALJ 99-01-CMP, 2000 WL 35825411, at *9

(H.U.D.O.H.A. May 26, 2000) (dismissing Lead Paint Act claim against leasing agents as

"fatally defective" because the defendants were "not real estate agents or brokers . . . who

entered into contracts with [the owner] to lease apartments," but were simply "at-will employees

[of the property management agent who are] exempt from the requirements of [HUD

regulations]").

**b.    Analysis**

Pilla argues that the Complaint fails to state a Lead Paint Act claim because (1)

Plaintiffs have failed to allege sufficient facts to give rise to a "plausible inference" that Pilla was

an "agent" of the Durands, or that he "knowingly" violated the statute; and (2) the Lead Paint

Act does not apply to attorneys "who are retained separate and apart from a real estate

agent/broker." (Pilla Br. (Dkt. No. 85) at 7-8)

The Complaint alleges that the Property "was constructed and erected before 1978

and is target housing"; that Plaintiffs "entered into a residential contract of sale" with the

Durands on March 9, 2015; and that the Durands did not comply with their statutory obligations

to disclose known lead-based paint hazards and known records of lead-based paint hazards. (See

Cmplt. (Dkt. No. 1) ¶¶ 12, 23, 31) The facts pled in the Complaint are sufficient to establish that

the Property constitutes target housing; that Plaintiffs fall within the statute's definition of

purchaser"; that the sellers failed to comply with their disclosure obligations under the statute;

and that the sale contract was signed after the regulations became effective. See Sweet, 235 F.3d

at 85 (noting that the regulations became effective on "September 6 or December 6, 1996,

depending on the type of residential structure involved").

    The Complaint does not plead facts demonstrating that Pilla was an "agent" of the

sellers within the meaning of the Lead Paint Act and its implementing regulations, however.

Plaintiffs simply allege – in conclusory fashion – that Pilla acted as the Durands' "real estate

attorney and agent," and did not ensure that the Durands complied with the Lead Paint Act,

including the obligation to disclose any known lead-based hazards. (See id. ¶¶ 9, 16, 24, 34, 49,

50) Although the residential contract of sale lists Pilla as the "[a]ttorney for [s]eller," (see

Ilkowitz Aff., Ex. B (Residential Sale Contract) (Dkt. No. 87-2) at 10), the Complaint does not

allege facts demonstrating that Pilla entered into a specific "contract with a seller . . . [or] a

representative of the seller . . . for the purpose of selling . . . target housing." See 24 C.F.R. §

35.86. For this reason, Plaintiffs fail to state a claim under the Lead Paint Act against Pilla, and

this claim will be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). See Kearney, 2008 WL

3502116, at *4 (evidence that defendant "was listed as a 'listing agent' on a listing sheet for the

property at some point prior to the sale" was insufficient to "establish the existence of a

contractual relationship between [defendant] and [the seller]"); Am. Rental Mgmt. Co., et. al,

HUDALJ 99-01-CMP, 2000 WL 35825411, at *9 (finding claim for "agent" liability "fatally

defective" because the alleged agents "[we]re not real estate agents or brokers (that is,

independent contractors) who entered into contracts with [the lessor] to lease the apartments[]").[3]

---

[3] Given the Court's ruling, it need not address Pilla's argument that the Lead Paint Act does not
extend to attorneys performing closings for sellers. Because Plaintiffs may seek to amend their
Lead Paint Act claim against Pilla, however, discussion of the Act's applicability to lawyers
performing closings may be useful.

As an initial matter, there is no specific reference to attorneys in the statutory or regulatory provisions addressing agent obligations and liability. Instead, as discussed above, the statute contains a "compliance assurance" provision requiring HUD and EPA to promulgate regulations imposing duties on the seller or lessor's "agent":

> Whenever a seller or lessor has entered into a contract with an agent for the purpose of selling or leasing a unit of target housing, the regulations promulgated under this section shall require the agent, on behalf of the seller or lessor, to ensure compliance with the requirements of this section.

42 U.S.C. § 4852d(4) (emphasis added).

Moreover, the definition of "agent" in the implementing regulations is limited to persons "who enter[] into a contract with a seller . . . [or] a representative of the seller . . . for the purpose of selling . . . target housing." See 24 C.F.R. § 35.86 (emphasis added). The legislative history underlying the regulations implementing 42 U.S.C. § 4852d's directives suggests that the regulations are intended to apply to real estate agents and brokers. On November 2, 1994, in connection with disseminating proposed regulations for public comment, HUD and EPA explained that the "agent" definition is designed to capture "various real estate activities," given that state laws vary as to whether real estate agents are employees or independent contractors:

> [I]t is EPA's and HUD's understanding that in many states, it is typical for a seller or lessor to enter into a contract to sell or lease target housing with a licensed "real estate broker," who may or may not perform the actual duties of an "agent" associated with selling or leasing housing. In these states, individuals working for the licensed broker, typically called "real estate agents," may perform some or all of the duties of an "agent" but may be treated as an employee of the broker or independent contractor. If the "real estate agent" were to fail to ensure compliance with the requirements of the rulemaking, the broker would assume liability for that failure, just as if the broker had performed all agent duties themselves. In other states, the real estate agent is considered an independent contractor rather than an employee of the broker, and the agent, rather than the broker, is held liable for negligence under common-law. Because of these variations in state law, EPA/HUD propose a flexible definition of agent, one that could include broker and/or agent, depending on the particular circumstance.

See Proposed Requirements for Disclosure of Information Concerning Lead–Based Paint in Housing, 59 Fed. Reg. 54,984, 54, 987 (Nov. 2, 1994) (emphasis added). After the close of the public comment period, the agencies published the final regulations in the Federal Register on March 6, 1996. See Requirements for Disclosure of Known Lead–Based Paint and/or Lead–Based Paint Hazards in Housing, 61 Fed. Reg. 9064, 9066 (Mar. 6, 1996). Responding to criticism that the "agent" definition was "needlessly vague," the agencies explained that

> Listing agents typically enter into a contract with the seller and represent the seller. "Buyer" agents, however, often enter into a contractual relationship with a seller or the seller's agent

### 2. Fraud Claim

Pilla also contends that Plaintiffs have not stated a fraud claim against him under Fed. R. Civ. P. 9(b), because Plaintiffs do not allege sufficient facts to establish scienter or justifiable reliance. (Pilla Br. (Dkt. No. 85) at 11-12) Plaintiffs "concede that [they] cannot sustain a cause of action for fraud against Pilla." (Pltf. Br. (Dkt. No. 88) at 22) Accordingly, Plaintiffs' fraud claim against Pilla will be dismissed.

### 3. Negligent Misrepresentation Claim

Pilla argues that Plaintiffs have not stated a claim for negligent misrepresentation, because the Complaint does not plead facts demonstrating that Plaintiffs and Pilla had a "special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff[s]." (Pilla Br. (Dkt. No. 85) at 12)

---

but may represent both the seller and the purchaser in the real estate transaction. EPA and HUD have revised this definition so that any party entering into a contractual relationship directly with the seller or lessor (or indirectly with a representative of the seller or lessor) for the purpose of selling or leasing the target housing, is an "agent" for the purposes of this rule. As a consequence, listing agents, selling agents, and buyer agents (if paid by the seller or through a cooperative brokerage agreement with the listing agent), are "agents" and are responsible for ensuring compliance under the rule.

Id. at 9069 (emphasis added).

In sum, nothing in the statute or its implementing regulations suggests that the Lead Paint Act was designed to impose liability on a transactional attorney whose sole involvement is to prepare closing documents and represent the seller at the closing.

It is also worth noting that every case this Court has found discussing "agent" liability has applied it to real estate agents or brokers. See, e.g., G.M.M., 92 F. Supp. 3d at 59, 75 (discussing "agent" liability of real estate agent who showed the apartment to the lessees); Smith v. Coldwell Banker Real Estate Servs., 122 F. Supp. 2d 267-68, 275 (D. Conn. 2000) (discussing "agent" liability of real estate broker and real estate agent who listed and showed the property to the purchaser); Renick v. Sperau, No. Civ. CCB-12-1627, 2013 WL 1314417, at *7 (D. Md. Mar. 29, 2013) ("[Lead Paint Act] requires real estate agents who contract with sellers to ensure compliance on behalf of the sellers."). Given that the Lead Paint Act was enacted in 1992, it is noteworthy that no court has entertained the possibility of imposing liability under this statute on an attorney who performed closing responsibilities.

Under New York law, "'[a] claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information.'" Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc., 910 F. Supp. 2d 543, 546 (S.D.N.Y. 2012) (quoting Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 180 (2011)). "It is black letter law in New York that a party can assert a negligent misrepresentation claim against a professional only where there is either actual contractual privity or a relationship 'so close as to approach that of privity.'" Eaves v. Designs for Fin., Inc., 785 F. Supp. 2d 229, 255 (S.D.N.Y. 2011) (internal quotation marks omitted) (quoting Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson, 73 N.Y.2d 417, 424 (1989)). Relevant criteria for finding such a relationship include: "(1) [an] awareness that the reports were to be used for a particular purpose or purposes; (2) reliance by a known party or parties in furtherance of that purpose; and (3) some conduct by the defendants linking them to the party or parties and evincing defendant's understanding of their reliance." Ossining Union Free Sch. Dist., 73 N.Y. 2d at 424.

Here, the Complaint is devoid of any factual allegations demonstrating the existence of a "special or privity-like relationship" between Pilla and Plaintiffs. Indeed, Plaintiffs do not even contend that this element is satisfied. (See Pltf. Br. (Dkt. No. 88) at 20-22) Instead, Plaintiffs suggest that this requirement does not apply because Plaintiffs' claims are "not against Pilla as a professional or attorney, but as an agent of the Durand [d]efendants." (Id. at 22) But this argument does not address the fact that the "existence of a special or privity-like relationship" is a prerequisite for bringing a negligent misrepresentation claim. See Abu Dhabi

<u>Commercial Bank</u>, 910 F. Supp. 2d at 546.[4]

In any event, even if Plaintiffs' failure to satisfy this element could somehow be excused, the Complaint pleads no facts regarding the nature of Pilla's involvement in the sale of the Property, or his contact or dealings with Plaintiffs.

Pilla's motion to dismiss Plaintiffs' negligent misrepresentation claim will be granted.

### 4.    <u>Negligence Claim</u>

Lastly, Pilla moves to dismiss Plaintiffs' negligence claim on the grounds that he did not owe Plaintiffs "a legal duty as a matter of law." (Pilla Br. (Dkt. No. 85) at 13)

"[T]o establish a <u>prima facie</u> case of negligence under New York law, a plaintiff must show '(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty, and (3) injury to the plaintiff as a result thereof.'" <u>In re World Trade Ctr. Lower Manhattan Disaster Site Litig.</u>, 758 F.3d 202, 210 (2d Cir. 2014) (quoting <u>Caronia v. Philip Morris USA, Inc.</u>, 715 F.3d 417, 428 (2d Cir. 2013)).  Moreover, it is well settled "that an attorney may not be held liable for negligence in the provision of professional services adversely affecting one with whom the attorney is not in contractual privity." <u>Nat'l Westminster Bank USA v. Weksel</u>, 124 A.D.2d 144, 145 (1st Dept. 1987) (collecting cases) (dismissing negligence claim, because there was "no contractual privity between plaintiff and defendant law firm nor any assertion thereof in the pleading"); <u>Redhead v. Winston & Winston, P.C.</u>, No. 01 Civ. 11475

---

[4]  Plaintiffs also cite no law in support of their argument.  The cases Plaintiffs do cite do not even involve negligent misrepresentation claims.  <u>See</u> <u>Heredia v. United States</u>, 887 F. Supp. 77, 80 (S.D.N.Y. 1995) (discussing whether employees involved in automobile accident were agents of the United States government for purposes of liability under the Federal Tort Claims Act); <u>Maurillo v. Park Slope U-Haul</u>, 194 A.D.2d 142, 147 (1993) (discussing the "family automobile doctrine," under which a parent is held responsible "for liability incurred through the authorized use of an automobile owned and used for family purposes").

24

(DLC), 2002 WL 31106934, at *5 (S.D.N.Y. Sept. 20, 2002) ("Because [plaintiff] has failed to allege any facts establishing an attorney-client relationship between him and the . . . [d]efendants, his negligence claim against them must be dismissed.").

Because Plaintiffs were not in contractual privity with Pilla, their negligence claim against him will be dismissed.

## B.    Pilla's Motion to Dismiss Cross-Claims

Pilla has moved to dismiss the "cross-claims for contribution and indemnification" alleged by the Durands, Houlihan Lawrence, and Carmody. (See Pilla Br. (Dkt. No. 85) at 14; Am. Ans. (Dkt. No. 29) at 6-7; Ans. (Dkt. No. 59) at 12) Pilla has not substantively briefed the issue or explained why he is entitled to dismissal. (See Pilla Br. (Dkt. No. 85))

The Durands oppose Pilla's motion, contending merely that "[i]f Plaintiffs' Complaint [against Pilla] is sufficient as a matter of law, then the Durands' cross-claims seeking contribution and indemnity are also sufficient." (Durands Br. (Dkt. No. 83) at 6) The entirety of the Durands' brief is thus devoted to analyzing whether Plaintiffs' claims against Pilla are sufficient to state a claim. (See id. at 6-14) Accordingly, Pilla and the Durands are proceeding on the premise that if Plaintiffs' claims against Pilla survive, the Durands' cross-claims likewise survive, and if Plaintiffs' claims against Pilla are dismissed, the Durands' cross-claims for common-law contribution and indemnity against Pilla will likewise be dismissed.

Houlihan Lawrence and Carmody have not filed any opposition to Pilla's motion to dismiss their cross-claims for contribution and/or indemnification, and accordingly have abandoned their cross-claims against Pilla. See Martinez v. City of New York, No. 11 Civ. 7461 (JMF), 2012 WL 6062551, at *1 (S.D.N.Y. Dec. 6, 2012) ("A court 'may, and generally will,

deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.'" (quoting Lipton v. Cty of Orange, N.Y., 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004)); Div. 1181 Amalgamated Transit Union-New York Emps. Pension Fund v. R & C Transit, Inc., No. 2:16-Civ-02481 (ADS) (ARL), 2018 WL 794572, at *3 (E.D.N.Y. Feb. 7, 2018) (holding that defendant "abandoned its claims for indemnification and contribution" by failing to submit a brief in opposition to a motion to dismiss).

### 1. Cross-Claims for Common-law Contribution and Indemnification

The Durands assert a cross-claim for common-law contribution against Pilla, alleging that if they are found liable to Plaintiffs then they are "entitled to contribution from any judgment over and against" Pilla "on the basis of apportionment of responsibility for the alleged occurrence." (Ans. (Dkt. No. 29) at 6)

Houlihan Lawrence and Carmody likewise assert a cross-claim for common-law contribution and/or indemnification. These defendants allege that if they are found liable to Plaintiffs, the resulting damages "will have been caused or contributed by reason of the negligence and/or culpable conduct of the co-Defendants, and [Houlihan Lawrence and Carmody] will be entitled to common-law contribution and/or indemnification from the co-defendants for the Plaintiffs' damages." (Ans. (Dkt. No. 59) ¶¶ 76-77)

"Contribution is a remedy available 'to [a]ny tortfeasor who pays more than its fair share of a judgment – as apportioned by the factfinder in terms of relative culpability' against other joint tortfeasors." Amusement Indus., Inc. v. Stern, 693 F. Supp. 2d 319, 324 (S.D.N.Y. 2010) (quoting Sommer v. Fed. Signal Corp., 79 N.Y.2d 540, 556 (1992) (citing N.Y. C.P.L.R. §§ 1401–02)). "The crucial element in allowing a claim for contribution to proceed is that 'the breach of duty by the contributing party must have had a part in causing or augmenting

the injury for which contribution is sought.'" Id. (quoting Raquet v. Braun, 90 N.Y.2d 177 (1997)). "Therefore, to succeed on [their] claim[s] for contribution, [the Durands, Houlihan Lawrence, and Carmody] must establish that [Pilla's] negligence caused or contributed to the damage to [Plaintiff]." Amguard Ins. Co. v. Getty Realty Corp., 147 F. Supp. 3d 212, 218 (S.D.N.Y. 2015).

"Under New York law, common-law (or implied) indemnity 'is a restitution concept which results in a shifting of the loss 'because to fail to do so would result in the unjust enrichment of one party at the expense of the other.'" Id. (quoting Facilities Dev. Corp. v. Miletta, 180 A.D.2d 97 (3d Dept. 1992). "[C]ommon-law indemnity is 'barred altogether where the party seeking indemnification was itself at fault, and both tortfeasors violated the same duty to the plaintiff.'" Id. (quoting Monaghan v. SZS 33 Associates, L.P., 73 F.3d 1276, 1284 (2d Cir. 1996)). Indeed, a common-law indemnity claim is "available only where one tortfeasor is held liable purely on account of another's negligence." Id. Accordingly, "[a] cause of action for common-law indemnification can be sustained only if: (1) the party seeking indemnity and the party from whom indemnity is sought have breached a duty to a third person, and (2) some duty to indemnify exists between them." Id.

Because (1) the Durands, Houlihan Lawrence, and Carmody's common-law cross-claims for contribution and/or indemnification are premised on the merits of Plaintiffs' claims against Pilla, and (2) Plaintiffs' claims against Pilla will be dismissed, the Durands, Houlihan Lawrence, and Carmody have not demonstrated that Pilla's actions contributed to Plaintiffs' injury. Moreover, Houlihan Lawrence and Carmody have pled no facts demonstrating that Pilla owes a duty to indemnify them. See Amusement Indus., Inc., 693 F. Supp. 2d at 325-26 (dismissing claim for indemnification because "the conduct of the proposed indemnitor must

have caused the loss for which the proposed indemnitee has been found liable," and defendant "provides no allegations that explain why he is entitled to indemnity"). Accordingly, Pilla's motion to dismiss the common-law cross-claims for contribution and/or indemnification alleged by the Durands, Houlihan Lawrence, and Carmody will be granted.

### 2. The Durands' Cross-Claim for Contractual Indemnification

The Durands also assert a cross-claim for contractual indemnification against Pilla. (Ans. (Dkt. No. 29) at 7) The Durands allege that "[a]t the time of the accident alleged . . . a contract was in effect between" them and the other co-Defendants, including Pilla, which requires Pilla to "indemnify and/or hold harmless [the Durands] for all claims, losses, liability and damages for any injury to any person." (Id.) According to the Durands, Pilla "breached the contract and [is] obligated to indemnify [the Durands] for any judgment or settlement obtained by any plaintiff in this action, including defense costs and attorneys' fees." (Id.)

"'A party is entitled to full contractual indemnification provided that the 'intention to indemnify can be clearly implied from the language and purposes of the entire agreement and the surrounding facts and circumstances.'"" Iannuzzi v. Washington Mut. Bank, No. 07 Civ. 964 (JFB) (WDW), 2008 WL 3978189, at *11 (E.D.N.Y. Aug. 21, 2008). Indeed, "it is elementary that the right to contractual indemnification depends upon the specific language of the contract." Gillmore v. Duke/Fluor Daniel, 221 A.D.2d 938, 939 (4th Dept. 1995).

Although the Durands allege – in boilerplate fashion – that they entered into an indemnification agreement with all of their co-defendants, they have not pled facts regarding the specific language of their alleged indemnification agreement with Pilla, when it was entered into, whether it was written or oral, or any of the facts or circumstances of the alleged indemnification agreement. In the absence of such facts, the Durands have not pled a plausible contractual

indemnification claim against Pilla. Accordingly, the Durands' cross-claim for contractual indemnification against Pilla will likewise be dismissed.

### C.    <u>Leave to Amend</u>

Plaintiffs request leave to amend the Complaint in the event that this Court finds that their claims against Pilla are deficient. (Pltf. Br. (Dkt. No. 88) at 23)

District courts "ha[ve] broad discretion in determining whether to grant leave to amend," <u>Gurary v. Winehouse</u>, 235 F.3d 792, 801 (2d Cir. 2000), and leave to amend should generally be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). A court may properly deny leave to amend, however, in cases of "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc.'" <u>Ruotolo v. City of New York</u>, 514 F.3d 184, 191 (2d Cir. 2008) (quoting <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962)); see also <u>Murdaugh v. City of New York</u>, No. 10 Civ. 7218 (HB), 2011 WL 1991450, at *2 (S.D.N.Y. May 19, 2011) ("Although under Rule 15(a) of the Federal Rules of Civil Procedure leave to amend complaints should be 'freely given,' leave to amend need not be granted where the proposed amendment is futile."). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." <u>Lucente v. IBM Corp.</u>, 310 F.3d 243, 258 (2d Cir. 2002) (citation omitted).

While it appears doubtful that Plaintiffs will be able to cure the defects in their claims against Pilla, this Court will grant leave to amend. Any motion to amend the Complaint is to be filed within thirty days of this decision. Similarly, the Durands are granted leave to amend their cross-claims for contractual indemnification against Pilla, and will file any amended

answer within thirty days.

## V.    **JUDICIAL TITLE'S MOTION FOR SUMMARY JUDGMENT**

        Judicial Title has moved for summary judgment on Plaintiffs' negligence claim, arguing that the claim (1) is barred because the certificate of title merged with the title insurance policy; and (2) fails as a matter of law, because Judicial Title did not owe Plaintiffs a duty to determine whether or not the Property was contaminated with lead-based paint. (Judicial Title Br. (Dkt. No. 79) at 13-15) Judicial Title has also moved for summary judgment on the Durands' cross-claim for contribution. (See Jud. Title Br. (Dkt. No. 79) at 15-16; Jud. Title Reply (Dkt. No. 94) at 4 n. 1).

### A.    **The Certificate of Title's Merger with the Title Insurance Policy**

#### 1.    **Applicable Law**

        It is well settled that "a title insurance policy is separate and distinct from a contract for a title search, and a cause of action for a negligent title search may not be asserted under a title insurance policy." Timac Realty v. G&E Tremont, LLC, 2013 N.Y. Misc. LEXIS 2051, *10 (Sup. Ct. New York Cty. 2013), aff'd sub. nom TIMAC Realty v. G & E Tremont LLC, 121 A.D.3d 457 (1st Dept. 2014); Citibank, N.A. v. Chicago Title Ins. Co., 214 A.D.2d 212, 216 (1st Dept. 1995) (It is "well-settled law that a cause of action for negligence in searching title does not lie in an action on the policy."). Indeed, "a policy of title insurance is a contract by which the title insurer agrees to indemnify its insured for loss occasioned by a defect in title." L. Smirlock Realty Corp. v. Title Guarantee Co., 52 N.Y.2d 179, 188 (1981). "The contract is one of insurance against defects in title, unmarketability, liens, and [e]ncumbrances. The risks of title insurance end where the risks of other kinds begin. . . . It must follow, as a general rule, therefore, that when the insured gets a good title the covenant of the insurer has

been fulfilled, and there is no liability." <u>Trenton Potteries Co. v. Title Guarantee & Tr. Co.</u>, 176 N.Y. 65, 72 (1903). Accordingly, title insurance is "'more in the nature of a covenant of warranty against encumbrances,'" and the "'doctrine of . . . negligence has no application to a contract of title insurance.'" <u>Citibank</u>, 214 A.D.2d at 216 (citations omitted).

Although "[a] cause of action for negligence may be maintained on the certificate of title," <u>Timac Realty</u>, 2013 N.Y. Misc. LEXIS 2051, *10 (citations omitted); <u>Citibank</u>, 214 A.D.2d at 216 ("The contract for a title search is separate and distinct from the contract of insurance; liability for a negligent search arises from the former."), where "the certificate merges with a subsequently issued title insurance policy, 'any action for damages arising out of the search – whether sounding in tort or contract – is foreclosed.'" <u>Timac Realty</u>, 2013 N.Y. Misc. LEXIS 2051, at *10 (quoting <u>Citibank</u>, 214 A.D.2d at 217 (quoting <u>L. Smirlock Realty Corp. v. Title Guarantee Co.</u>, 70 A.D.2d 455, 465 (2d Dept. 1979), <u>aff'd as modified</u>, 52 N.Y.2d 179 (1981)). Under such circumstances, the title insurance policy voids the certificate of title, and "all causes of action are restricted to [the policy's] terms[.]" <u>Id.</u> at *10-11 (citations omitted); <u>Chu v. Chicago Title Ins. Co.</u>, 89 A.D.2d 574, 574 (2d Dept. 1982) ("The terms of the contract sued upon specifically and unambiguously disclaim responsibility for the certificate of occupancy violation[,] . . . and the contract further provides: . . . 'All actions or proceedings against this company must be based on the provisions of this policy. Any other action . . . that the insured may have or may bring against this company in respect of other services rendered in connection with the issuance of this policy, shall be deemed to have merged in and be restricted to its terms and conditions.' Accordingly, the complaint which alleges a cause of action sounding in negligence as well as breach of contract, is inadequate as a matter of law.'" (citations omitted)).

## 2.    **Analysis**

Plaintiffs' negligence claim against Judicial Title arises out of its failure to discover the presence of lead-based paint hazards in the Property, and to disclose those hazards to Plaintiffs.  (See Cmplt. (Dkt. No. 1) ¶¶ 62-67; Pltf. Br. (Dkt. No. 90) at 13-14)

It is undisputed, however, that Judicial Title's Certificate of Title contains a merger provision stating that

> [a]ny claim arising by reason of the issuance hereof shall be restricted to the terms and conditions of the standard for of [sic] title insurance policy.  If title, interest or lien to be insured was acquired by the prospective insured prior to delivery hereof, the Company assumes no liability except under its policy when Issued.

(Morano Decl., Ex. 5 (Certificate of Title) (Dkt. No. 77-5) at 1)  The Certificate of Title also includes a number of "Conditions and Stipulations."  Condition and Stipulation Nos. 2 and 10 provide:

> The certificate is preliminary to the issuance of such policy or policies of title insurance and all liability and obligations hereunder shall cease and terminate six months after the effective date hereof when the policy or policies committed for shall be issued by this company.
> . . . .
> When municipal department searches are requested or required, the accuracy of the returns therein are not guaranteed nor are such searches continued beyond the date of the original search.  Any Certificate of Occupancy, Certificates of Completion or Building Permits issued subsequent to the date of this certificate, or any dismissals or notices of removal of any building or housing violations set forth herein, must be submitted to this company prior to closing if an amendment to any of the municipal department searches is requested or required as this company does not independently conduct such searches.

(Id. at 2)  It is likewise undisputed that the Certificate of Title's effective date is January 1, 2015, and that Judicial Title -- acting as the agent for First American Insurance Company -- issued the Title Insurance Policy on June 19, 2015.  (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶¶ 11, 15; Morano Decl., Ex. 5 (Certificate of Title) (Dkt. No. 77-5) at 1)

Accordingly, under the terms of the Certificate of Title, the Certificate of Title "merge[d] with the subsequently issued title insurance policy[]" on June 19, 2015, and Plaintiffs' negligence claim based on Judicial Title's title search is "foreclosed." See Citibank, 214 A.D.2d at 217 (certificate of title merged with subsequently issued title insurance policy where the certificate of title contained a provision stating, "This Commitment is preliminary to the issuance of such policy . . . of title insurance and all liability and obligations hereunder shall cease and terminate nine months after the effective date hereof or when the policy . . . committed for shall issue, whichever first occurs"); Cane v First Am. Title Ins. Co. of N.Y., 2015 N.Y. Misc. LEXIS 1706, *5, 10 (Suffolk Cty. Sup. Ct. 2015) ("[T]he Certificate of Title contains a provision that states, '[t]his Agreement to insure shall terminate . . . (2) upon the issuance of title insurance in accordance herewith.' As such, the Court finds that plaintiff is foreclosed from asserting a claim for damages against Water Mill [– the title insurance agent acting on behalf of First American Title Insurance Company –] with respect to the title search it performed."); Timac Realty, 2013 N.Y. Misc. LEXIS 2051, *10-11 ("[R]egardless of whether plaintiff's third cause of action sounds in negligence or contract, and regardless of whether it is asserting claims under the certificate or the policy, as the certificate was voided by the policy, and as the policy expressly provides that all causes of action are restricted to its terms, there exists no basis for holding [the title agent] or [the title insurance company] liable for the search.").[5]  Moreover, it is undisputed

---

[5]  Plaintiffs contend that their claim against Judicial Title is not barred by the merger of the certificate of title with the title insurance policy, because that rule only applies to the title insurance company, and here Plaintiffs are asserting a negligence claim against Judicial Title – "the title agent or title abstractor" – not the title insurance company.  (Pltf. Br. (Dkt. No. 90) at 13-14)  Plaintiffs cite no authority for this proposition, however, and none of the cases Plaintiffs do cite involve a merger provision.  Indeed, Plaintiffs' cases merely stand for the unremarkable proposition that – in the absence of such a provision – a title agent may be liable to an insured for a negligent title search that fails to disclose title defects.  See Herbil Holding Co. v.

that Plaintiffs are not asserting any claim under the Policy. (See Def. R. 56.1 Stmt. (Dkt. No. 76)

¶ 21; Pltf. R. 56.1 Counterstmt. (Dkt. No. 98) ¶ 21)

Judicial Title's motion for summary judgment on Plaintiffs' negligence claim will

be granted.

### B. Whether Judicial Title Had a Duty to Determine Whether the Property Contained Lead-Based Paint

Judicial Title argues that Plaintiffs' negligence claim fails as a matter of law

because Judicial Title did not owe Plaintiffs a duty to determine whether the Property was

contaminated with lead-based paint. (Judicial Title Br. (Dkt. No. 79) at 13-15)[6]

---

Commonwealth Land Title Ins. Co., 183 A.D.2d 219, 221-23, 229 (2d Dept. 1992) (noting in dicta that insured might have a negligence claim against title agent for negligent title search, where prior record owner successfully challenged foreclosure judgment pursuant to which insured had purchased the property at a foreclosure sale); Byrnes v. Palmer, 18 A.D. 1, 2, 4-5 (2d Dept. 1897) (holding that attorney who examined title was liable for negligence where there was a preexisting mortgage on the property and plaintiff was ousted from the land, because a "purchaser of real estate is entitled . . . to a marketable, title."), aff'd, 160 N.Y. 699 (1899).

In any event, it is well established that "the liability of an abstractor may be limited and controlled by the contract regardless of whether the action is on the contract or in negligence." L. Smirlock Realty Corp., 70 A.D.2d at 465; see also TIMAC Realty v. G & E Tremont LLC, 121 A.D.3d 457, 458 (1st Dept. 2014) (affirming dismissal of contract and negligence claims against the title agent because "[p]laintiff's claim that defendants breached their . . . obligations under the title report by providing a negligent survey is conclusively refuted by the [certificate of title], which states, '[t]his certificate shall be null and void . . . upon the delivery of the policy'" (citations omitted)); Cane, 2015 N.Y. Misc. LEXIS 1706, at *10 ("With respect to plaintiff's [negligence claim] as against [the title agent], it is also well-settled that if a negligence claim is based upon a certificate of title, and the certificate merges with a subsequently issued insurance policy, 'any action for damages arising out of the search – whether sounding in tort or contract – is foreclosed[.]'" (quoting Citibank, 214 A.D.2d at 217)).

[6] Plaintiffs have not submitted a substantive response to this argument. Indeed, Plaintiffs have not cited any case in which liability has been imposed on a title insurance company or title agent for failure to discover and disclose lead-based paint. (See Pltf. Br. (Dkt. No. 90) at 12-13) To the contrary, all of the cases Plaintiffs cite involve circumstances in which good title to the property was not conveyed. See Stewart Title Ins. Co. v. Equitable Land Servs., Inc., 207 A.D.2d 880, 881 (2d Dept. 1994) (granting title insurer summary judgment against title agent for erroneously stating that a judgment lien against property had been released); Herbil Holding Co.,

"[M]arketability of title is concerned with impairments on title to a property, i.e., the right to unencumbered ownership and possession, not with legal public regulation of the use of the property." Voorheesville Rod & Gun Club, Inc. v. E.W. Tompkins Co., 82 N.Y.2d 564, 571 (1993). "[T]itle reports function to apprise title insurers of defects in title; they do not serve to warn prospective purchasers of every risk facing the property." TIMAC Realty, 121 A.D.3d at 458 (dismissing plaintiff's claims against title agent and insurer based on their failure to disclose water meter charges in the title report; "[i]f plaintiff relied on the title report for a list of water meters on the property, it did so at its own risk"). Accordingly, "the possible presence of environmental hazards on property does not implicate marketability of title, regardless of any potential remediation which might be required of the owner, since such a situation affects the property's value, not 'one's right to 'unencumbered ownership and possession.''" Cone v. Stranahan, 44 A.D.3d 1145, 1147 (3d Dept. 2007) (citations omitted); see also Voorheesville Rod & Gun Club, Inc., 82 N.Y. 2d at 571 ("[A] zoning ordinance, existing at the time of the contract, which regulates only the use of the property, generally is not an encumbrance making the title unmarketable.").

Judicial Title also gave clear written notice to Plaintiffs that it was not warranting that its report concerning municipal records regarding the Property was complete and accurate. As discussed above, Schedule B to the Title Report contains a list of items that would appear as exceptions from coverage. (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 2; Pltf. R. 56.1 Counterstmt. (Dkt. No. 98) ¶ 2) Schedule B expressly states that "municipal departmental searches are not insurable

183 A.D.2d at 221-23, 229 (noting in dicta that insured might have a negligence claim against title agent where prior owner successfully challenged foreclosure judgment pursuant to which insured had purchased the property at a foreclosure sale); Byrnes, 18 A.D. at 4-5 (holding that attorney who examined title was liable for negligence where there was a pre-existing mortgage on the property).

items and this company assumes no liability for the accuracy." (Morano Decl., Ex. 2 (Schedule B) (Dkt. No. 77-2) at 1) In its municipal data search report, Judicial Title also disclosed that it had not searched municipal health records. (See Morano Decl., Ex. 4 (Departmental Search Report) (Dkt. No. 77-4) at 1)

In sum, even if Plaintiffs' negligence claim were not foreclosed by the merger of the certificate of title with the Policy, Plaintiffs' claim would still fail as a matter of law, because Judicial Title did not owe Plaintiffs a duty to determine whether (1) the Property was contaminated with lead paint; or (2) there were municipal records disclosing such contamination. See Brucha Mortg. Bankers Corp. v. Nations Title Ins. of New York, Inc., 275 A.D.2d 337, 338 (2d Dept. 2000) (dismissing claim against title insurance company because "inasmuch as a valid title was transferred, and it received a valid and enforceable first mortgage lien on the property[,] . . . the defendant satisfied its obligations under the policy").

## C. The Durands' Cross-Claim Against Judicial Title

Judicial Title has moved for summary judgment on the Durands' cross-claim for common-law contribution. (See Jud. Title Br. (Dkt. No. 79) at 15; Jud. Title Reply Br. (Dkt. No. 94) at 4 n. 1-2) The Durands' oppose Judicial Title's motion, contending that "should Plaintiffs' claims [against Judicial Title] ultimately be determined to have merit, the Durands' cross-claim[] for contribution . . . should also have merit." (See Durands Br. (Dkt. No. 81) at 5)

As discussed above, in order to succeed on their claim for contribution, the Durands "must establish that [Judicial Title's] negligence caused or contributed to the damage to [Plaintiffs]." See Amguard Ins. Co., 147 F. Supp. 3d at 218. The Durands assert that they are "entitled to contribution from any judgment over and against" Judicial Title "on the basis of apportionment of responsibility for the alleged occurrence." (Ans. (Dkt. No. 29) at 6) Because

36

(1) the Durands' common-law cross-claim for contribution against Judicial Title is predicated on the merits of Plaintiffs' claims against Judicial Title, and (2) Plaintiffs' claims against Judicial Title fail as a matter of law, the Durands have not demonstrated that Judicial Title is jointly liable to Plaintiffs. Accordingly, Judicial Title is entitled to summary judgment on the Durands' cross-claim for contribution.

## VI.  JUDICIAL TITLE'S MOTION FOR RULE 11 SANCTIONS

Judicial Title has also moved for Rule 11 sanctions against Plaintiffs and their counsel "in the amount of Judicial Title's attorneys' fees and costs incurred following the filing of Plaintiffs' Complaint in this action on February 1, 2017, including fees and costs for the motion for sanctions." (Jud. Title Mot. (Dkt. No. 102))

### A.  Applicable Law

"Rule 11 permits a court to impose sanctions upon attorneys, law firms, or parties for making or causing to be made certain improper representations to the court." Salovaara v. Eckert, III, 222 F.3d 19, 32 (2d Cir. 2000). "[I]n assessing a claim for Rule 11 sanctions, courts apply a standard of 'objective unreasonableness.'" Pentagen Techs. Int'l Ltd. v. United States, 172 F. Supp. 2d 464, 471 (S.D.N.Y. 2001) (quoting Ted Lapidus, S.A. v. Vann, 112 F.3d 91, 96 (2d Cir. 1997)), aff'd, 63 Fed. Appx. 548 (2d Cir. 2003). "The district court has broad discretion in determining whether to grant Rule 11 sanctions." Id. at 470.

In the Second Circuit,

> [a] pleading, motion or other paper violates Rule 11 either when it "has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law."

Kropelnicki v. Siegel, 290 F.3d 118, 131 (2d Cir. 2002) (emphasis omitted) (quoting W.K.

Webster & Co. v. Am. President Lines, Ltd., 32 F.3d 665, 670 (2d Cir. 1994)). "[A]t the very

least, [counsel must] . . . have a basis for a good faith belief that the papers on their face appear

to be warranted by the facts asserted and the legal arguments made, and are not interposed for

any improper purpose." Long v. Quantex Res., Inc., 108 F.R.D. 416, 417 (S.D.N.Y. 1985)

(footnote omitted), aff'd, 888 F.2d 1376 (2d Cir. 1989). Accordingly, Rule 11 imposes an

affirmative "duty on every attorney to conduct a reasonable pre-filing inquiry into the

evidentiary and factual support for the claim, and to certify that the legal arguments are

supported by existing law, and therefore that they are not frivolous." Capital Bridge Co. v. IVL

Techs. Ltd., No. 04 Civ. 4002 (KMK), 2007 WL 3168327, at *10 (S.D.N.Y. Oct. 26, 2007)

(citing Fed. R. Civ. P. 11(b)).

   Although Rule 11 also permits sanctions against a represented party, "a

represented party should not be sanctioned . . . unless the party had actual knowledge that the

filing of the papers constituted wrongful conduct, e.g. the papers made false statements or were

filed for an improper purpose." Calloway v. Marvel Entm't Grp., 854 F.2d 1452, 1474 (2d Cir.

1988), rev'd on other grounds sub nom. Pavelic & LeFlore v. Marvel Entm't Grp., 493 U.S. 120

(1989). "'[W]hen a party has participated in the filing of a paper signed by the attorney or has

signed a paper himself but did not realize that such participation or signing was wrongful, then

sanctions against the party are also not appropriate.'" Watkins v. Smith, No. 12 Civ. 4635

(DLC), 2013 WL 655085, at *10-11 (S.D.N.Y. Feb. 22, 2013) (quoting Calloway, 854 F.2d at

1474-75), aff'd, 561 F. App'x 46 (2d Cir. 2014). "Of course, where the party does know that the

filing and signing is wrongful[,] . . . [or] [w]here a party misleads an attorney as to facts or the

purpose of a lawsuit[,] . . . then sanctions on the party . . . are appropriate." Id. at *11 (citations

omitted).

"Rule 11 and principles of due process require that 'the subject of a sanctions motion be informed of: (1) the source of authority for the sanctions being considered; and (2) the specific conduct or omission for which the sanctions are being considered so that the subject of the sanctions motion can prepare a defense.'" <u>Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.</u>, 682 F.3d 170, 175 (2d Cir. 2012) (quoting <u>Schlaifer Nance & Co. v. Estate of Warhol</u>, 194 F.3d 323, 334 (2d Cir. 1999)) Under Rule 11's safe harbor provision, the subject of the sanctions motion must be served with the motion at least 21 days in advance of the filing of the sanctions motion. <u>See</u> Fed. R. Civ. P 11(c)(2); <u>Star Mark Mgmt., Inc.</u>, 682 F.3d at 176.

**B.  Analysis**

Here, there is no dispute that Judicial Title has complied with Rule 11's safe harbor provision.  In a March 13, 2017 letter, Judicial Title notified Plaintiffs that their negligence claim against Judicial Title was frivolous because (1) the certificate of title had merged in the subsequently issued title insurance policy, and accordingly Plaintiffs' negligence claim against Judicial Title was foreclosed; and (2) Judicial Title did not have a duty to search for or disclose lead-based paint hazards.  (Pashman Decl., Ex. 2 (March 13, 2017 letter) (Dkt. No. 103-2) at 1-3)  Judicial Title further notified Plaintiffs of its intent to file a motion for sanctions in the event that Plaintiffs did not withdraw their negligence claim against Judicial Title.  (<u>See</u> <u>id.</u> at 1)  Plaintiffs took no action, and six months later – on September 13, 2017 – Judicial Title served its motion for sanctions on Plaintiffs' counsel in accordance with Rule 11(c)(2).  (<u>See</u> Jud. Title Mot. (Dkt. No. 102) at 2; Mazzola Decl. (Dkt. No. 106) ¶ 17)

To the extent that Judicial Title seeks Rule 11 sanctions directly against Plaintiffs, Judicial Title has not demonstrated that they had "actual knowledge that the filing constituted

wrongful conduct." See Calloway, 854 F.2d at 1474-75. Moreover, Plaintiffs' counsel

represents that Plaintiffs relied on counsel for advice on the "validity of their claim against

Judicial Title." (See Pltf. Br. (Dkt. No. 107) at 13) Accordingly, Judicial Title's motion for

sanctions directly against Plaintiffs will be denied.

Judicial Title's motion for sanctions against Plaintiffs' attorney Jean-Claude

Mazzola (see Jud. Title Mot. (Dkt. No. 102) at 5) will be granted, however. It should have been

apparent from the outset of this litigation that Plaintiffs' negligence claim against Judicial Title

was baseless. It is clear – under the Certificate of Title's express terms – that the Certificate of

Title merged with the title insurance policy, and that a negligence claim arising out of Judicial

Title's title search is thus "foreclosed." See, e.g., Timac Realty, 2013 N.Y. Misc. LEXIS 2051,

at *10 (quoting Citibank, 214 A.D.2d at 217 (quoting L. Smirlock Realty Corp., 70 A.D.2d at

465)); Chu, 89 A.D.2d at 574. Moreover, even if there were any confusion as to the

applicability of the merger doctrine to title agents under New York law – which there is not (see

TIMAC Realty, 121 A.D.3d at 458 (1st Dept. 2014) (affirming dismissal of contract and

negligence claims against the title agent because plaintiff's claims are "conclusively refuted by

the [certificate of title], which states, '[t]his certificate shall be null and void . . . upon the

delivery of the policy'" (citations omitted)); Cane, 2015 N.Y. Misc. LEXIS 1706, *5, 10

(holding that merger doctrine precluded a claim against the title agent and the title insurance

company)) – it is clear that Judicial Title did not owe Plaintiffs a duty to search for lead-based

paint in the Property, or to determine whether there were municipal records revealing such

contamination. See Cone, 44 A.D.3d at 1147; Voorheesville Rod & Gun Club, Inc., 82 N.Y. 2d

at 571. For these reasons, Plaintiffs' negligence claim against Judicial Title fails as a matter of

law.

Plaintiffs' counsel "concede[s] that case law exists, as cited by Judicial Title, which challenges Plaintiff[s'] negligence claim against Judicial Title," but argues that "the case law is at best unsettled." (Pltf. Br. (Dkt. No. 107) at 10) If this were so, Judicial Title's sanctions motion would be properly denied. There is no evidence that the law concerning these matters is unsettled, however. Indeed, Plaintiffs' counsel has not cited any case holding a title agent liable for a negligent title search where a merger provision was in place, let alone any case holding a title agent liable in negligence for failure to discover lead-based paint. (See Pltf. Br. (Dkt. No. 107); Pltf. Br. (Dkt. No. 90)) Instead, as discussed above, all of the cases Plaintiffs' counsel cites merely stand for the proposition that – in the absence of a merger provision – a title agent may be liable to an insured where a negligent title search fails to disclose title defects. See Stewart Title Ins. Co. v. Equitable Land Servs., Inc., 207 A.D.2d 880, 880 (2d Dept. 1994); Herbil Holding Co. v. Commonwealth Land Title Ins. Co., 183 A.D.2d 219, 221-23, 229 (2d Dept. 1992); Byrnes v. Palmer, 18 A.D. 1, 2, 4-5 (2d Dept. 1897). Moreover, while Plaintiffs' counsel contends that there are "strong public policy considerations" supporting the negligence claim against Judicial Title, Plaintiffs' counsel does not articulate what those public policy considerations are, nor does Plaintiffs' counsel make a good faith argument for the reversal or modification of existing law. (See Pltf. Br. (Dkt. No. 107) at 7; Mazzola Decl. (Dkt. No. 106) ¶ 24; Pltf. Br. (Dkt. No. 90))

Accordingly, this Court concludes that Plaintiffs' negligence claim against Judicial Title violates Federal Rule of Civil Procedure 11(b)(2), because the claim is not "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law[.]" Judicial Title's motion for sanctions against Plaintiffs' counsel will be granted.

**CONCLUSION**

Defendant Judicial Title's motion for summary judgment (Dkt. No. 75) is granted, and Defendant Alan Pilla's motion to dismiss (Dkt. No. 82) is granted. Judicial Title's motion for sanctions (Dkt. No. 102) is granted in part and denied in part as set forth above. Judicial Title's requests for oral argument on its motions (Dkt. Nos. 100, 111) are denied as moot. The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 75, 82, 100, 102, 111).

As to the appropriate amount of a sanctions award, Judicial Title will make its submission by April 5, 2018. Plaintiffs will file a response by April 13, 2018.

Dated: New York, New York
    March 27, 2018

SO ORDERED.

Paul G. Gardephe
United States District Judge